**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**AMBER LOVELLETTE**                                                                    **PLAINTIFF**

**v.**                                           **Case No. 2:19-cv-00083-LPR**

**CARLOS JOSE PERES LAGOS INC,**                                      **DEFENDANTS**
**DOUGLAS TORRES**

## <u>CERTIFICATION ORDER</u>

This case arises from an accident involving two large tractor-trailers on Interstate 40.  The cab of one tractor-trailer slammed into the back of the other tractor-trailer.  Because of the impact of the crash, the driver got stuck in the cab that hit the back of the other tractor-trailer.  He died in a fire that started at the time of (or immediately after) impact.

The decedent's name is Raymond Lovellette.  The Special Administratrix of Mr. Lovellette's estate asserts claims against the driver of the other tractor-trailer, Douglas Torres, as well as the company for whom Mr. Torres was driving.  The Complaint alleges that Mr. Torres negligently caused the accident.  The Complaint also alleges that Mr. Torres's refusal to render assistance to Mr. Lovellette violated Arkansas Code section 27-53-103 and was a proximate cause of Mr. Lovellette's death.  And the Complaint alleges that the Defendant Company is liable under the doctrine of *respondeat superior*.

Pending before the Court is Defendants' Motion for Summary Judgment.[1]  One portion of this Motion is easily resolved.  In her summary judgment papers, Plaintiff Amber Lovellette

---

[1]   Defs.' Mot. for Summ. J. (Doc. 32).

expressly abandons her claims that Mr. Torres negligently caused the accident.[2]  Ms. Lovellette is correct to do so, given the facts in the record.  Defendants are entitled to summary judgment on that portion of the Complaint.

According to Ms. Lovellette, the foregoing concession does not resolve the entire case.  She argues that one part of her Complaint survives summary judgment:  her claim that Mr. Torres "was negligent [for] . . . failing to render any reasonable aid to a person involved in a collision as required by A.C.A. § 27-53-103" and that this failure was a proximate cause of Mr. Lovellette's death.[3]  Ms. Lovellette also argues that, pursuant to the doctrine of *respondeat superior*, the company for whom Mr. Torres worked is also liable under this theory of failure to render assistance.[4]

The Arkansas statute regarding the rendering of reasonable assistance by those involved in vehicular accidents has been around—in slightly different iterations—for a pretty long time.[5]  Despite the statute's long history, neither party has provided the Court with a single case from the Arkansas state court system that analyzes the statute.  As seen in footnote five, the Court has identified a few cases that discuss the statute.  But none of those cases answer the significant questions of law presented here: Does the statute create a duty to render reasonable assistance, the breach of which necessarily constitutes negligence (or some other actionable wrong) for purposes of a civil liability action brought by a private party?  What is the meaning of "reasonable assistance" in the statute and thus the scope of any corresponding duty?  Is the determination of

---

[2]   Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34) at 2 n. 1 ("Discovery has revealed no negligence on the part of [Defendant Driver] in causing the collision.").

[3]   Pl.'s Compl. (Doc. 1) ¶ 7; *see generally* Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34).

[4]   *See* Pl.'s Compl. (Doc. 1).

[5]   *See Modica v. State*, No. CACR04-00209, 2004 WL 2810231 at * 2 (Ark. App. Dec. 8, 2004) (citing *Barnhill v. State*, 247 Ark. 28, 30, 444 S.W.2d 97, 98 (1969)).  *See also Carter v. Montgomery*, 226 Ark. 989, 994-95, 296 S.W.2d 442, 445 (1956); *Benson v. State*, 212 Ark. 905, 909, 208 S.W.2d 767, 769 (1948).

what constitutes "reasonable assistance" a question of law for the Court or a question of fact for the jury?

The Court concludes that the most appropriate path forward in this case is to certify these serious legal questions to the Arkansas Supreme Court.  The Court's respect for the independent and often primary role of states and state courts in our federalist system compels this approach.  The legal questions at issue here implicate the interpretation of an important state statute and its potentially significant effect on state common law and public policy.  And the lack of relevant state court precedent leaves this Court without any good guideposts to make an intelligent determination as to how the Arkansas Supreme Court would resolve these questions.  The Court has no interest in "making law" here, let alone "making law" for a state.

Under Arkansas Supreme Court and Court of Appeals Rule 6-8, the Arkansas Supreme Court has the discretion to "answer questions of law certified to it by order of a federal court" in circumstances such as are present in this case.[6]  The Rule states that "[a] certification order shall contain . . . the question of law to be answered[,] the facts relevant to the question, showing fully the nature of the controversy out of which the question arose[,] a statement acknowledging that the Supreme Court, acting as the receiving court, may reformulate the question[,] and the names and addresses of counsel of record and parties appearing without counsel."[7]

In Section I below, the Court sets forth the relevant facts.  In Section II, the Court sets forth Defendants' arguments for summary judgment.  In Section III, the Court sets forth Plaintiff's arguments against summary judgment.  In Section IV, the Court sets forth the specific questions of law that it requests the Arkansas Supreme Court answer.  In Section V, the Court sets forth the

---

[6]   ARK. R. SUP. CT. & CT. APP. 6-8(a).

[7]   ARK. R. SUP. CT. & CT. APP. 6-8(c)(1).

required statement regarding potential reformulation of the questions and the required names and addresses.  In Section VI, the Court directs the Clerk of Court to transmit this Order, along with a paper and electronic copy of the entire record, to the Clerk of the Arkansas Supreme Court.

## I.  Relevant Facts

We are at the summary judgment stage.  Most of the facts are not disputed.  With respect to the few facts that are disputed,[8] the Court takes the facts (and the reasonable inferences therefrom) in the light most favorable to the non-moving party.  Ms. Lovellette is the non-moving party.[9]

### A.  The Accident and the Resulting Fire

On May 12, 2018, two large tractor-trailers were traveling westbound on Interstate 40 near mile marker 260 in St. Francis County, Arkansas.[10]  The tractor-trailer operated by Mr. Torres was ahead of (west of) the tractor-trailer operated by Mr. Lovellette.[11]  Mr. Torres's flatbed truck was hauling pipes.[12]  Mr. Lovellette was driving a tractor-trailer with a large rectangular van trailer attached that was owned by USA Truck, Inc.[13]  The roadway was flat and straight.[14]  The weather was clear.[15]  Because of traffic and construction, Mr. Torres slowed to a stop.[16]  At the time of the

---

[8]   As a general matter, the disputes of fact in this case are genuine.

[9]   The questions of law this Court herein certifies are not directly affected by the few genuinely disputed facts in this case.

[10]   Ex. 1 to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34-1) ¶¶ 1-2.

[11]   *Id.* ¶ 2.

[12]   Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-2) at 33:17-23; *see also* Ex. 5 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-5).

[13]   Ex. 1 to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34-1) ¶ 1; *see also* Ex. 5 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-5); Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 14.  The contents of the USA Truck are unknown.

[14]   Ex 1 to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34-1) ¶ 3.

[15]   *Id.* ¶ 4.

[16]   *Id.* ¶ 5; *see also* Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-2) at 26:23-27:2; Ex. 2 to Defs.' Reply (Doc. 35-2) at 5:12-6:2.

accident, the tractor-trailer driven by Mr. Torres "was at a complete stop, fully within its lane of travel and with its emergency flashing lights activated."[17]

Mr. Lovellette did not stop, and his tractor-trailer slammed into the back of Mr. Torres's truck at a significant rate of speed.[18]   A bystander witness estimated that Mr. Lovellette was traveling at approximately sixty-five to seventy miles per hour when the accident occurred.[19]   Ms. Lovellette disputes the witness's estimation, but provides no facts or expert opinion to suggest a different rate of speed.[20]   In any event, at the moment of collision (or a few moments thereafter), a "small fire" began on the passenger side of the box truck that "slowly start[ed] to engulf the cab of" Mr. Lovellette's tractor-trailer.[21]   It took "about 15 or 20 minutes" for the fire to get "to the point [that] it was a full conflagration."[22]

### B.  Mr. Torres's Actions After the Accident

The accident occurred at approximately 12:34 pm.[23]   When the accident occurred, Mr. Torres at least momentarily blacked out or lost consciousness.[24]   Mr. Torres did not then, and does not now, know how long this black-out or loss of consciousness lasted.[25]   In any event, it is clear that Mr. Torres suffered some type of brain trauma, although the extent of the trauma is unclear.[26]

---

[17]   Ex. 1 to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34-1) ¶ 8.

[18]   *Id.* ¶¶ 6-7.

[19]   *Id.* ¶ 7.

[20]   *Id.*

[21]   *Id.* ¶ 10; Ex. 2 to Defs.' Reply (Doc. 35-2) at 7:13-16.

[22]   Ex. 1 to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. 34-1) ¶ 10; Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 7:25-8:6.

[23]   Ex. 2 to Defs.' Reply (Doc. 35-2) at 12:15-17; Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 16.

[24]   Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-2) at 32:1-11.

[25]   *Id.*

[26]   *Id.*; *see also id.* at 64:7-12, 66:20-67:1.

When Mr. Torres "woke up," he was "lying down on the seat because the back of the seat had broken and was in the horizontal position."[27] "Everything was all over the place" in his truck.[28] At that moment, he claims that he didn't know what was going on, he "didn't feel anything," he "didn't see anything," and he "had no idea what was behind [him]."[29] Mr. Torres says his "concern was [his] trailer."[30] Once Mr. Torres "finished waking up" and "trying to be more conscious," he "found the phone" and called his wife.[31] Mr. Torres is not a fluent English speaker, but his wife is.[32] When the phone call began, he was in the tractor-trailer cab.[33] He told her that he was hit from behind.[34] He then immediately exited the cab while still on the phone.[35] As Mr. Torres was getting out of the cab, he says that he "look[ed] behind" and saw that the other tractor-trailer was on fire.[36] Mr. Torres told his wife there was a fire and his wife told Mr. Torres to "grab the [fire] extinguisher" in his cab.[37] Mr. Torres replied that the fire extinguisher "was way too small" to put

---

[27] *Id.* at 22:20-22.

[28] *Id.* at 23:3-4.

[29] *Id.* at 22:22-25.

[30] *Id.* at 22:24-25.

[31] *Id.* at 23:1-6.

[32] *Id.* at 19:1-25.

[33] *Id.* at 23:1-6.

[34] *Id.* at 23:9-10.

[35] *Id.* at 23:11-14.

[36] *Id.*

[37] *Id.* at 23:11-17.

out the fire.[38]  Mr. Torres's wife told Mr. Torres she was going to call the police.[39]  The two then ended their call.

The accident occurred near an overpass.  A passing truck driver, Leon Gibson, and his wife saw the accident occur from the overpass.[40]  They "jumped out of [their truck] and ran over to the edge" of the overpass.[41]  As they got to the edge, they could "hear" Mr. Lovellette "asking for help, because, obviously, he was very well pinned inside the vehicle." [42]  And "*at the same time*" they saw Mr. Torres "remove[] himself from the truck and walk[] away from the scene of the accident towards underneath the overpass . . . ."[43]  Then, "abruptly," Mr. Torres "ran back to his truck, climbed into his truck, and . . . went into the sleeper" of the truck.[44]  He "was only in his sleeper for a couple seconds."[45]  When he came out, he "exited the truck and started to walk away from the accident again."[46]  At this point, there was a "small fire on the passenger side" of Mr. Lovellette's tractor-trailer.[47]  The Court does not know anything more about the characteristics or

---

[38]  *Id.* at 23:17-19. Mr. Torres concedes that the fire extinguisher was secured in his tractor-trailer's cab prior to the accident and thus that he could have gotten to the fire extinguisher even after the accident occurred. *Id.* at 43:10-16; 45:20-23.  Mr. Torres acknowledged that a fire extinguisher is important to have in case of a short circuit from the fuse box. *Id.* at 46:2-5.  His testimony also implies that the extinguisher could be used on fires that start in other ways. *Id.* at 46:2-21.  However, Mr. Torres testified that the type of fire extinguisher that he had in his cab was "for something small," "[n]ot for something big," and that a fire "has to be a very small fire to be able to be handled with that size of an extinguisher." *Id.* at 46:16-47:8.  He did agree that the fire extinguisher would "probably" be "sufficient to put out a small fire." *Id.* at 46:22-47:8.

[39]  *Id.* at 23:23.

[40]  Ex. 2 to Defs.' Reply (Doc. 35-2) at 5:15-6:2.

[41]  *Id.* at 6:4-5.

[42]  *Id.* at 6:4-8.

[43]  *Id.* at 6:10-14 (emphasis added).

[44]  *Id.* at 6:12-16.

[45]  *Id.* at 7:2-3.

[46]  *Id.* at 7:3-5.

[47]  *Id.* at 7:13-16, 18:12-21.

location of the "small fire," except that it could be seen by Mr. Gibson from the overpass and that it had not yet fully engulfed the truck.[48]

"[A]nother driver from another truck company" ran down from the overpass to the highway "to assist the . . . driver that was pinned in his truck . . . ."[49]  Mr. Gibson testified that the Good Samaritan first got to the tractor-trailers about "ten minutes" after the accident.[50]  Mr. Gibson testified that the Good Samaritan "tried very hard" to pull Mr. Lovellette's cab door open.[51]  The door would not open.[52]

A few minutes later, Mr. Torres again walked from underneath the overpass back to the cab of his tractor-trailer.[53]  The Good Samaritan went over to Mr. Torres and engaged in some type of conversation.[54]  By then, according to Mr. Gibson, "the small fire on the passenger side of the [second tractor-trailer] . . . was slowly starting to engulf the cab of the truck . . . ."[55]  Mr. Torres once again walked to underneath the overpass.[56]  The Good Samaritan went back to Mr.

---

[48]  *Id.* at 7:13-16, 18:12-21.

[49]  *Id.* at 7:5-7.  This Good Samaritan is apparently unidentified and has not offered testimony in this case.

[50]  *Id.* at 30:21-24.

[51]  Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 20:17-18.

[52]  *Id.* at 20:12-15.

[53]  *Id.* at 7:2-16.

[54]  *Id.*  In direct deposition testimony, Mr. Gibson said that the Good Samaritan "asked [Mr. Torres] to help," that Mr. Torres "wouldn't help," and that the Good Samaritan "raised his hands like, you know, why aren't you helping me."  *Id.* at 7:10-12.  However, on cross examination, Mr. Gibson walked this testimony back.  He acknowledged that, while he described the interaction as "arguing" in a written statement to the police, he could not actually hear what the Good Samaritan and Mr. Torres were saying to each other.  *Id.* at 25:16-21; 29:4-20.  He could see them "gesturing with their hands at each other," but he did not know what they were saying.  *Id.* at 29:11-20.  Mr. Torres testified that the Good Samaritan was trying to get Mr. Torres to move his truck.  Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-2) at 62:11-63:10.  Mr. Torres's position is that the Good Samaritan was "waving with his hands" to emphasize his request that Mr. Torres move his truck.  *Id.* at 63:4-6.  The Good Samaritan was repeating the words "[m]ove the truck."  *Id.* at 63:6-7.  Mr. Torres testified that he could not move the truck because the key was broken and something had come off the ignition so he could not start the engine.  *Id.* at 62:22-63:10.

[55]  Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 7:13-16.

[56]  *Id.* at 7:2-16.

Lovellette's tractor-trailer and continued to try to get the door open.[57]  Mr. Gibson testified that, at this point, the Good Samaritan's fire-extinguisher could not have put out the fire.[58]  Ultimately, the fire became too much, and the Good Samaritan stopped trying to open the cab door.[59]  Mr. Gibson estimated the time between when the fire started and when "it got to the point it was a full conflagration" was "probably about 15 to 20 minutes."[60]

When law enforcement and emergency medical personnel arrived, Mr. Torres was still there.[61]  It is unclear if the Good Samaritan was still there, but there is no statement to the police from the Good Samaritan in the record.  Mr. Torres provided information to the authorities and was then transported to the hospital by an ambulance.[62]  Mr. Gibson provided a statement to the authorities as well.[63]

Mr. Gibson testified that, during the entire episode, Mr. Torres did "absolutely nothing" to try and help Mr. Lovellette.[64]  Mr. Gibson testified that he heard "[c]ries for help and assistance [from Mr. Lovellette] to a certain point, and then after that one certain point, it was just cries of excruciating pain and then eventually silence."[65]  When asked what Mr. Torres could have done to help, Mr. Gibson implied that, "if [Mr. Torres] had rendered assistance with [the Good Samaritan]," they could have opened the door together.[66]  Mr. Gibson acknowledged that this was

---

[57]  *Id.* at 7:18-20.

[58]  *Id.*  The Good Samaritan had a fire extinguisher on him, but it is not clear if he ever tried to use it.  *Id.* at 7:18-20, 20:19-22.

[59]  *Id.* at 7:5-20, 20:12-18; 32:2-4.

[60]  *Id.* at 7:25-8:6.

[61]  Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-2) at 39:1-13; 64:7-12.

[62]  *Id.* at 64:10-12.

[63]  Ex. 3 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-3) at 16.

[64]  *Id.* at 8:8-10.

[65]  *Id.* at 8:19-22.

[66]  *Id.* at 31:7-18.

supposition and that it was based on an assumption—specifically, that Mr. Torres had a "pinch bar that could have been jammed between the doorjamb" of Mr. Lovellette's door to "pr[y]" it open.[67] Mr. Gibson acknowledged he was "assuming" that Mr. Torres had a pinch bar because he believed that all flat-bed drivers "carry some kind of pinch bar."[68]  There is no evidence as to whether Mr. Torres had a pinch bar with him and, if he did, where it was after the accident.  Mr. Gibson also acknowledged that he did not know "to what extent [Mr. Lovellette] was pinned in the truck," including whether "the steering wheel was pinned up against his chest or the rear of the trailer from the flatbed was pinned up against his chest . . . ."[69]

### C.  Cause of Death

An autopsy showed that Mr. Lovellette died of "smoke and soot inhalation."[70]  To put a fine point on it, the fire killed him.  He was alive and conscious after the accident, based on the bystander testimony.  And the autopsy makes clear that the "only internal evidence of antemortem blunt force injury consisted of three right rib fractures."[71]

## II.  Defendants' Arguments

Defendants' principal argument starts from the observation that, "[a]t common law," there was and is "generally no duty to affirmatively aid another."[72]  Defendants add to this observation the general rule that statutes in derogation of the common law are to be strictly construed.[73]  Putting these ideas together, Defendants argue that Arkansas Code section 27-53-103 does not "create[]"

---

[67]   *Id.* at 31:12-16.

[68]   *Id.* at 31:17-18.

[69]   *Id.* at 31:23-32:1.

[70]   Ex. 4 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34-4) at 1.

[71]   *Id.* at 7.

[72]   Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 11.

[73]   *Id.* at 12.

a "duty to rescue," much less one that is enforceable by a private party in a civil lawsuit.[74]   That is, according to Defendants, even assuming that any civil liability duty is created by the statute at all, and even assuming that such a duty can be enforced by a private citizen in a civil lawsuit, the duty would be limited to remaining on the scene, calling for help if possible, and transporting (or arranging the transport for) an injured person from the scene to the hospital or a doctor if it is apparent that treatment is necessary or if it is requested by the injured person.[75]

Aside from their public policy arguments, Defendants are in essence relying on variants of the *ejusdem generis* and *noscitur a sociis* canons of statutory interpretation.   Their point is that the general term "reasonable assistance" is not as capacious as it might seem in a vacuum divorced from the rest of the statute; the term is limited in degree and kind to assistance that is similar to the specific types of assistance that the statute contemplates in subsections (a)(1),[76] (a)(2)[77] and (b)(1).[78]   Defendants argue that:

> The precise language of the statue requires one involved in a collision to provide "reasonable assistance" to another, which may be fairly limited to the making of arrangements for transport from the scene for medical treatment.   This does not equate with a legal duty to rescue.   Defendants have found no case in any jurisdiction where civil liability was imposed on a person that remained on the

---

[74]   *Id.* at 3, 10-14.

[75]   *Id.* at 12-13.

[76]   ARK. CODE ANN. § 27-53-103(a)(1) ("The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle that is driven or attended by any person shall give his or her name, address, and the registration number of the vehicle he or she is driving.").

[77]   ARK. CODE ANN. § 27-53-103(a)(2) ("Upon request and if available, the driver shall exhibit his or her driver's license or commercial driver's license to the person struck, or the driver or occupant of, or person attending, any vehicle collided with and shall render to any person injured in the accident reasonable assistance, including the transporting, or the making of arrangements for the transporting, of the person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if transporting is requested by the injured person.").

[78]   ARK. CODE ANN. § 27-53-103(b)(1) ("The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle that is driven or attended by any person shall remain at the scene of the accident for a reasonable time in order to be present if the driver knows that a law enforcement agency was contacted for assistance unless it is necessary for the driver to leave the scene of the accident to render assistance as required by subdivision (a)(2) of this section.").

scene of an accident but was unable or unwilling to rescue another person involved in the accident. The cases all appear to address situation[s] where a driver has left the scene, and thus left the injured person to their own fate. Here, of course, Mr. Torres remained on the scene until he was transported via ambulance. The Court should construe the statutory obligation to provide "reasonable assistance" to include an obligation to remain on the scene and, if possible, call for help; the statute should not be construed to include a duty to rescue or undertake extraordinary measure beyond calling for help.[79]

Defendants also present a fallback position regarding the statutory language. They argue that summary judgment is appropriate even if the statutory term "reasonable assistance" imposes some more general "duty to render aid."[80]   In Defendants' view, whatever the contours of the statutory definition of reasonable assistance might be, it definitely does not include a requirement that a motorist (in this case a motorist with some extent of brain trauma) who was involved in but not the cause of an accident "take extraordinary measures," "expose themselves to danger," or be a hero "in an effort to rescue another."[81]   Defendants note that "[i]t is undisputed that Mr. Torres was injured in the accident," "[i]t [is] undisputed that Mr. Torres called for help as soon as he could," "[i]t is . . . undisputed that Mr. Lovellette's truck was on fire within minutes after the impact," and "[i]t is undisputed that Mr. Torres remained on the scene until he was transported away via ambulance."[82]   Under these circumstances, Defendants say that "reasonable minds could not differ in concluding that Mr. Torres" provided all the assistance that was reasonable.[83]

Defendants make two other arguments in favor of summary judgment. The first posits that Ms. Lovellette's concession that Mr. Torres bears no responsibility for the accident itself dooms

---

[79]   Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 13.

[80]   *Id.* at 15.

[81]   *Id.*

[82]   *Id.*

[83]   *Id.*

any claims related to Mr. Lovellette's eventual death.  Defendants argue the comparative-fault

statue (Arkansas Code section 16-64-122) applies to enhanced-injury cases like this one, and thus

any theoretical responsibility that Mr. Torres might have for Mr. Lovellette's death—based on a

failure to provide reasonable assistance—must be compared to Mr. Lovellette's responsibility for

causing the accident itself.  Defendants argue that "[i]n this case, reasonable minds could not differ

in concluding that Mr. Lovellette was one hundred percent at fault for the accident."[84]  The unstated

implication of Defendants' argument appears to be that, because Mr. Lovellette was a hundred

percent at fault for the accident itself, no rational jury could find that his share of the fault for his

death was less than Mr. Torres's share of the fault.  Under section 16-64-122(b)(2), "[i]f the fault

chargeable to a party claiming damages is equal to or greater in degree than any fault chargeable

to the party or parties from whom the claiming party seeks to recover damages, then the claiming

party is not entitled to recover such damages."[85]

Second, Defendants argue that Ms. Lovellette has provided no evidence from which a

rational jury could conclude that Mr. Torres's inaction was a proximate cause of Mr. Lovellette's

death.  Specifically, Defendants say that "there is no evidence as to what would have been required

to extract Mr. Lovellette, to extinguish the fire, or to take some other action that would have saved

[Mr. Lovellette's] life."[86]  Defendants say the jury would be left with only conjecture and

speculation on this point, which is inappropriate under Arkansas law.[87]  Defendants devote a

significant portion of their Reply brief to explain in detail what they see as the fatal evidentiary

insufficiencies or evidentiary gaps in Ms. Lovellette's hypothesis that Mr. Torres could have (1)

---

[84]   Defs.' Reply (Doc. 35) at 14.

[85]   ARK. CODE ANN. § 16-64-122(b)(2).

[86]   Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 15-16.

[87]   *Id.*

extinguished the fire or (2) helped the Good Samaritan open the cab door and get Mr. Lovellette out of the cab before he died.  This includes but is certainly not limited to the lack of expert witnesses such as an accident reconstruction expert or expert firefighter.

### III.    Plaintiff's Arguments

Ms. Lovellette argues that "while Mr. Torres' negligence did not cause the collision, a separate cause of action arises for new injuries, or the aggravation of original injuries, where a duty to render aid arises and is breached."[88]  Ms. Lovellette concedes that "[h]istorically, Anglo-American law recognized no general duty to assist one in danger, peril, or distress."[89]  And while alluding to the ongoing debate in the legal academy as to the propriety of such a rule, Ms. Lovellette emphasizes that this ongoing debate "is not engaged in this case."[90]  Rather, she argues that "[t]he general no-duty rule" has "broad exceptions that . . . impose a duty to aid one in peril," and that one such exception is "[w]here the duty is imposed by statute."[91]

It is difficult to tell whether Ms. Lovellette's argument is (1) that Arkansas Code section 27-53-103 itself creates civil liability for a breach of its provisions, or (2) that, because of the existence of Arkansas Code section 27-53-103, Arkansas's common law can be said to include a duty for motorists involved in an accident to provide reasonable assistance to others involved in the same accident.  In written briefing and at oral argument, Ms. Lovellette seems to use both theories interchangeably.  In any event, she says that Mr. Torres had a duty to render reasonable assistance to Mr. Lovellette.[92]  Instead of doing his duty, according to Ms. Lovellette, Mr. Torres

---

[88]   Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34) at 2.

[89]   *Id.* at 3.

[90]   *Id.* at 4.

[91]   *Id.*

[92]   *Id.* at 1.

did nothing at all to even try to help Mr. Lovellette.[93]  Ms. Lovellette agrees with Defendants that Mr. Torres did not have an "obligation to be a hero," but she says that Mr. Torres "did have an obligation to take minimal, common-sense steps that would not have placed him in any danger."[94]

Ms. Lovellette argues that the plain language of the statute shows that the definition of "reasonable assistance" is more capacious than minimal help like transport.[95]  She notes that the statute says "reasonable assistance, *including*" transport.[96]  She argues that, given this language, transport is just one of many types of reasonable assistance required by the statute.  She also argues that if "reasonable assistance" simply meant waiting for the police and calling for help, then either that term or the other more specific subsections of the statute would be superfluous.[97]  At bottom, Ms. Lovellette's point is that if the General Assembly meant to limit the definition of "reasonable assistance" as Defendants suggest, the General Assembly would have said so.  Instead, the General Assembly intentionally chose an undefined broad term like reasonable assistance to allow a jury to make case-by-case factual determination of reasonableness.[98]

Ms. Lovellette identifies "two minimal, reasonable, common sense avenues" that were "available to [Mr. Torres]," and she argues that neither would have "exposed him to an unreasonable risk of harm."[99]

> First, and most obviously, he could have put the fire out.  Recall that the fire started as a small fire on the passenger side of Mr. Lovellette's truck.  Mr. Torres had a fire extinguisher that he could have used to douse the fire before it grew to engulf the cab, which took at least 15 to 20 minutes after the collision.  A jury could

---

[93]  *Id.* at 1-2.

[94]  *Id.* at 1.

[95]  *Id.* at 7.

[96]  *Id.* at 6-8 (emphasis added).

[97]  *Id.*

[98]  *Id.* at 5-8.

[99]  *Id.* at 9.

> reasonably so conclude based on the evidence produced by the eyewitness Mr. Gibson. This would not be speculation. Juries are allowed to draw reasonable inferences and to utilize their common knowledge in doing so.
>
> Second, Mr. Torres could have helped the [Good Samaritan] with his efforts to open Mr. Lovellette's truck door. Two men making that effort increased the likelihood of its success. That likelihood would increase had Mr. Torres made use of the pinch bar he had to use to cinch down the straps holding the load on his trailer. A jury could reasonably so conclude based on the evidence produced by the eyewitness Mr. Gibson. This would not be speculation. Juries are allowed to draw reasonable inferences and to utilize their common knowledge in doing so.[100]

Ms. Lovellette says that it is up to the jury to determine (based on its view of all the facts) whether there was any "reasonable assistance" that Mr. Torres failed to give.[101] In her view, what "assistance" is "reasonable" under the circumstances is a quintessential jury question.

With respect to Ms. Lovellette's concession that Mr. Torres was not at fault for the accident itself, she argues that comparing the fault of Mr. Lovellette and Mr. Torres is another quintessential jury question.

> Undoubtedly, Mr. Lovellette's fault in causing the initial collision will be compared with Mr. Torres' fault in failing to render reasonable assistance. But the fact that Mr. Lovellette has some fault does not mean Plaintiff is precluded from any recovery at all. Rather, a jury question comparing the fault of the two drivers is presented.[102]

With respect to proximate causation, again Ms. Lovellette argues that it is up to the jury to determine whether the reasonable assistance was more likely than not to be successful.[103] Ms.

---

[100] *Id.* at 9-10 (internal citations omitted).

[101] *Id.*

[102] Pl.'s Sur-reply (Doc. 41) at 2.

[103] Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 34) at 9-11.

Lovellette says that the record evidence is enough to allow a rational jury to find that Mr. Torres's

inaction was a proximate cause of Mr. Lovellette's death.

> The size of the fire and the rapidity of its spread are described by
> Mr. Gibson.  So too are the efforts of the [Good Samaritan] to open
> the cab door.  The jury may deduce that had Mr. Torres assisted by
> putting out the fire, or assisted with the extraction attempt, Mr.
> Lovellette would have lived . . . .
>
> The question at the summary-judgment stage, of course, is not
> whose evidence is ultimately believed by a jury, is the weightier, or
> the more credible[;] nor is it what inferences must or will be drawn
> from the evidence.  Those are jury functions for trial, not judge
> functions when deciding summary-judgment motions.
>
> ***
>
> A jury has work to do in this case.  It bears repeating that Mr.
> Lovellette's injuries from the collision were not life threatening.  He
> died an excruciating death because he could not get out of the cab
> of his truck and fire eventually engulfed it.  Had the fire been
> extinguished or had he been removed from the cab, he would not
> have died.  Evidence exists from which a jury could conclude [that]
> had Mr. Torres met his duty of reasonable assistance Mr. Lovellette
> would not have died.[104]

## IV.   Certified Questions of Law to Be Answered at the Discretion of the Arkansas Supreme Court

The Court considers it pretty clear that, absent Arkansas Code section 27-53-103, there

would be no *legal* duty for Mr. Torres to render assistance to Mr. Lovellette in the circumstances

of this case.  The big dispute between the parties is whether section 27-53-103 changes the calculus

in a way that matters for this case.

The first certified question of law is as follows: As a matter of either Arkansas common

law or statute, and assuming proximately caused injury, can a private plaintiff bring a civil liability

---

[104]   *Id.* at 10-11 (internal citations omitted).

action based solely on a defendant's purported violation of Arkansas Code section 27-53-103's "reasonable assistance" requirement?

If the answer to the first question of law is yes, the second certified question of law is as follows: Under either Arkansas common law or statute, for purposes of civil liability, does a motorist who is involved in but not at fault for a vehicular accident have a duty to render "reasonable assistance" to the injured driver of the other vehicle?

If the answer to the second question of law is "yes," then there arise two further and somewhat interrelated certified questions of law: What is the definition of "reasonable assistance" in section 27-53-103(a)(2) and the consequent scope of the civil liability duty to render reasonable assistance in a case like the one at bar?  For purposes of determining the definition and scope of the civil liability duty owed, is the definition and scope of "reasonable assistance" a question of law for the Court or a question of fact for the jury?

## V.     Miscellaneous Certification Requirements

The Arkansas Supreme Court has the discretion to answer none, one, or all of the legal questions set out in Section IV above.  Furthermore, the Arkansas Supreme Court, acting as the receiving court, may reformulate any or all of the questions of law set out in Section IV above.

The name, address, phone number, and email for Plaintiff's counsel are as follows:

Lloyd W. Kitchens, III                    Matthew Eugene Hartness
Brad Hendricks Law Firm              Brad Hendricks Law Firm
500 Pleasant Valley Drive             500 Pleasant Valley Drive
Suite C                                        Suite C
Little Rock, AR 72227                    Little Rock, AR 72227
501-221-0444                               501-221-0444
Fax: 501-661-0196                        Email: mhartness@bradhendricks.com
Email: tkitchens@bradhendricks.com

Brian G. Brooks
Attorney at Law
Post Office Box 605
Greenbrier, AR 72058
501-733-3457
Fax: 501-376-0951
Email: bgbrooks1@me.com

The name, address, phone number, and email for Defendants' counsel are as follows:

Carl K. Wyatt, Jr.
Glassman, Wyatt, Tuttle & Cox, P.C.
26 North Second Street
Memphis, TN 38103
901-527-4673
Email: cwyatt@gewwlaw.com

## VI.    Conclusion

For the reasons discussed above, the Court grants summary judgment to Defendants on the portion of Ms. Lovellette's claims that alleged that Mr. Torres negligently caused the accident. The Court certifies the legal questions set forth in Section IV to the Arkansas Supreme Court. The Court directs the Clerk to immediately send a paper and electronic copy of this Order, along with a paper and electronic copy of the entire record, to the Clerk of the Arkansas Supreme Court.

The Motion for Summary Judgment and this case are stayed until the Arkansas Supreme Court responds to the Certification Order. The Court orders the Clerk to administratively terminate the Motion for Summary Judgment and administratively terminate this case. The case will be re-opened, and a status conference will be set, as soon as either party files a Notice with this Court that states the Arkansas Supreme Court has responded to the Certification Order. The parties will file a status report forty-five days from the date of this Order, and every forty-five days thereafter until the case is revived in this Court.[105]

---

[105]   Ms. Lovellette agrees with certification. Pl.'s Resp. to Court's Inquiry (Doc. 39) at 4. Defendants "have no objection" to certification but believe "there are independent grounds upon which the Court can dispose of the

IT IS SO ORDERED this 2nd day of March 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

instant case." Defs.' Br. on the Issue of Certified Questions (Doc. 40) at 1, 4. Defendants are wrong about the two grounds that they think are independent.

Take, for example, the proximate cause issue. If the Arkansas Supreme Court's answers to the certified questions show that Mr. Torres had no legal duty to render reasonable assistance or that he did not breach whatever duty he had, I will not need to resolve the proximate cause dispute. If the Arkansas Supreme Court's answers to the certified questions show that Mr. Torres did have and did breach (or may have breached) a legal duty to render assistance, this Court's proximate cause analysis for purposes of summary judgment will depend on the specifics of exactly how the Arkansas Supreme Court answers the certified questions. On this record, whether there is sufficient evidence for a rational jury to conclude that a breach of the duty to render reasonable assistance was a proximate cause of Mr. Lovellette's death depends on what particular omission counts as a breach. Without belaboring things, I will say that, for proximate cause purposes, the extinguishing-the-fire theory is more likely to pass summary judgement muster than the cab-extraction theory. The point is that this is not a case where I can jump over the duty and breach questions to resolve the proximate cause questions in a way that would avoid the need for the Arkansas Supreme Court to answer the duty and breach questions. The duty and breach questions influence the proximate cause analysis in a way that requires the duty and breach answers to come first.

With respect to Defendants' other purported independent ground, the Court agrees with Ms. Lovellette's argument. That Mr. Torres was not at fault for the accident itself may certainly lead a jury to conclude that Mr. Lovellette's fault for his own death is equal to or greater than Mr. Torres's fault. But "may" (or even "likely will") is not "must." In the Court's view, a rational jury could go the other way too. In short, if there was a duty of reasonable assistance and a breach of that duty by Mr. Torres that was a proximate cause of Mr. Lovellette's death, the fault for the accident itself does not preclude this case from going to a jury.